UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | Case No. |
| v. | : | Violation: |
| **TIMOTHY W. CANNON,** | : | 18 U.S.C. §§ 208(a) and 216(a)(2) |
| **Defendant.** | : | (Conflict of Interest) |

## INFORMATION

The United States Attorney charges:

## COUNT ONE
## Conflict of Interest

Unless specified otherwise, at all times material to this Information:

### Introduction

1. The Federal Emergency Management Agency ("FEMA") was a part of the United States Department of Homeland Security ("DHS"), which was an agency within the executive branch of the United States Government. FEMA provided a comprehensive emergency management system to protect the United States from hazards, including natural disasters and acts of terrorism. FEMA had more than 4,000 full-time employees.

2. TIMOTHY W. CANNON ("CANNON") was the Director of FEMA's Human Capital Division, which handled human resources and personnel matters at FEMA. CANNON's office was located at FEMA headquarters in Washington, D.C. CANNON previously worked at the Library of Congress from in or around April 2002 to in or around June 2007.

1

3.      Company A was an organization that provided polling and consulting services to public and private entities. Company A's headquarters were located in Washington, D.C.

### CANNON's Interest in Company A

4.      CANNON first applied for employment at Company A in or about 2004, when CANNON was an employee of the Library of Congress. Company A rejected CANNON's first employment application.

5.      On or about July 1, 2007, CANNON became the Director of the Human Capital Division at FEMA. As an employee of FEMA and member of the Senior Executive Service, CANNON received training on government ethics, including conflicts of interest by government employees.

6.      In or about 2007, CANNON and Company A had discussions about FEMA hiring Company A to provide consulting services on human resources matters at FEMA through a project that would eventually be called the "BEST Workforce Initiative."

7.      On or about March 22, 2008, Company A's chief executive officer ("CEO") met with CANNON and the Deputy Administrator at FEMA. Afterwards on or about that same day, Company A's CEO e-mailed another Company A employee about CANNON. Company A's CEO stated that CANNON "said he has done everything to get a job at [Company A] because he believes so much in our products . . . said he wants to do a real good job at FEMA and that mabye [sic] he would try again . . . ."

### Company A's Interest in CANNON

8.      On or about April 22, 2008, a Company A employee sent an e-mail to another Company A employee stating, "[Company A's CEO] wants to hire this guy. Tim Cannon."

9. On or about April 25, 2008, Company A's CEO remarked about CANNON in an e-mail to another Company A employee, ". . . [I]f [CANNON] gets us a big deal at FEMA . . . i [sic] think we should hire him . . . because he will be a 'client' hire . . . which might be good[.]" Later in the same e-mail chain, Company A's CEO asked, "[I]s the ink dry yet on our deal with fema [sic] [?]" The Company A employee replied, "[N]o might be mid-May." Company A's CEO then stated, "[W]e should wait of course to see if we win a big quality deal here[.]"

10. On or about August 12, 2008, utilizing an interagency agreement between FEMA and the United States Office of Personnel Management ("OPM"), Company A was selected to administer the BEST Workforce Initiative at FEMA. Under the agreement, Company A would conduct polls of FEMA employees and provide consulting services to FEMA as a subcontractor to Company B, an international consulting company, which already had an existing contract with OPM. The contract to administer the BEST Workforce Initiative was valued at approximately $6 million over 5 years. Company A would receive payments from FEMA through Company B. The BEST Workforce Initiative included the Great Manager Program, under which Company A would provide training to FEMA managers.

11. On or about November 18, 2008, a Company A employee advised Company A's CEO in an e-mail, "I talked to Tim today. He asked for a job." Company A's CEO then stated, "What about ethics . . . are we okay with all of that . . . he is a significant client . . . am sure you know the rules . . . gee he seems like a winner to me . . . I don't think these guys are as expensive as one might think . . . and he has a military background[.]"

### CANNON Participates in Securing Additional Funding for Company A

12. On or about December 16, 2008, CANNON e-mailed the Deputy Administrator and the Assistant Administrator for Management at FEMA to request additional funding for the BEST Workforce Initiative, including between $450,000 and $500,000 to expand the Great Manager Program to FEMA's regional offices.

13. On or about January 6, 2009, in an e-mail to a Company A employee about the Great Manager Program, CANNON stated, ". . . [A]h yes, I got another 500k put on the contract. Cool huh?"

14. On or about January 12, 2009, CANNON had an employment interview with Company A in Washington, D.C. At that interview, CANNON and Company A discussed, inter alia, salary terms for CANNON.

15. On or about January 16, 2009, CANNON and a Company A employee traded e-mails concerning additional funding for the BEST Workforce Initiative. The Company A employee inquired, "Did they transfer the funds into your account yet?" CANNON responded, "Working on the funds transfer . . . ."

16. On or about January 21, 2009, CANNON signed and approved a Requisition and Commitment for Services and Supplies form, known as a FEMA Form 40-1, for $500,000 in "[a]dditional funding to cover 9 additional Great Manager Training sessions in the BEST Workforce Program[.]" On or about that same day, the Assistant Administrator for Management at FEMA circulated an e-mail officially announcing the nine additional Great Manager Program courses for FEMA's regional offices.

17. In or around January and February 2009, CANNON signed two other FEMA Forms 40-1 to expand the Great Manager Program, this time to the "Preparedness Directoriate [sic]" at FEMA. On or about January 30, 2009, CANNON signed and approved a FEMA Form 40-1 for $1,000,000 in additional funding, and on or about February 3, 2009, CANNON signed and approved a FEMA Form 40-1 for $100,000 in additional funding. Both FEMA Forms 40-1 stated that they were for the "BEST Workforce Program administered by [Company A/Company B]."

<u>Company A's First Employment Offer Letter to CANNON</u>

18. On or about February 4, 2009, a Company A employee sent an e-mail to Company A's CEO concerning CANNON's prospective employment at Company A. In the e-mail, the Company A employee stated, "We've got him lined up to start first week in April. Need to get offer letter off to him by end of week. He is very excited." Company A's CEO inquired about CANNON's compensation at Company A. The Company A employee responded, "We talked yesterday about $175,000."

19. On or about February 9, 2009, Company A sent an employment offer letter, dated February 5, 2009, by e-mail to CANNON. The letter offered CANNON "the opportunity to join [Company A] as a Partner with our Government Division in Washington, D.C.[,]" and guaranteed CANNON a minimum annual salary of $175,000 for the first two years of employment. CANNON responded to the e-mail on or about the same day, stating, "I am very excited about joining [Company A] and I look forward to working with you . . . ."

20. Following CANNON's acceptance of Company A's employment offer, CANNON continued to oversee and work on the BEST Workforce Initiative at FEMA.

### CANNON Conceals CANNON's Pending Employment with Company A

21. On or about February 10, 2009, CANNON sent an e-mail to the Human Capital Division at FEMA announcing that CANNON was retiring at the end of the month. CANNON did not mention CANNON's pending employment at Company A, instead asserting, "I look forward to spending time with grandkids, playing on my boat and getting back into my regular exercise and health/wellness routine."

22. On or about February 11, 2009, an Ethics Attorney at FEMA sent an e-mail to CANNON stating, "I would encourage you to come see me about post-employment counseling before you leave, especially if you plan to work for a FEMA or DHS contractor upon retirement." CANNON responded, "Thanks . . . had [a] good discussion with [another FEMA Ethics Attorney] yesterday and I have reviewed the material provided with no current plans."

23. CANNON retired from FEMA effective on or about February 27, 2009.

24. On or about February 28, 2009, CANNON signed and submitted a Public Financial Disclosure Report, known as a Form SF-278, to a FEMA official in the District of Columbia. On the Form SF-278, CANNON certified, "[T]he statements I have made on this form and all attached schedules are true, complete and correct to the best of my knowledge." Schedule C, Part II, of the Form SF-278 instructed CANNON to report any agreements or arrangements for "future employment." In response to this instruction, CANNON checked the box indicating "none" and did not list any agreements or arrangements in the space provided on the form; specifically, CANNON did not list CANNON's future employment with Company A.

### Company A's "Updated" Employment Offer Letter to CANNON

25.     On or about February 27, 2009, CANNON requested that Company A provide him with an offer letter dated after February 27, 2009, so that it would falsely appear that CANNON received Company A's employment offer after CANNON had resigned from FEMA.

26.     On or about March 2, 2009, Company A sent an updated version of the offer letter, with the new date of March 2, 2009, to CANNON. CANNON signed this updated version of the offer letter on or about March 3, 2009, and returned it to Company A.

### Company A's Withdrawal of the Employment Offer

27.     In or about March 2009, a Company A employee voiced concerns internally about CANNON's hiring. In an e-mail dated March 10, 2009, the Company A employee stated, "[W]e need to have him provide an Ethics Advisory Opinion letter from his current agency as soon as possible . . . In Tim's case he has been working for FEMA and he should have contacted the agency's ethics official when first applying/pursuing a job at [Company A]."

28.     On or about March 25, 2009, a Company A employee stated in an e-mail to another Company A employee, "Well, I just got a call from and am getting more red flags about Tim Cannon. Apparently, word is getting around about his departure and joining [Company A]. There is speculation among is [sic] co-workers that this is improper. They are pretty mad. This may get in the way of future business with FEMA. . . . This, plus the bankruptcy, plus appearance of ethics violations, both on [Company A] and FEMA side. This is not good. . . . I think we are getting too many sign[s], and I do not think this will work."

29.     On or about March 26, 2009, CANNON e-mailed an Ethics Attorney at FEMA requesting an ethics letter regarding his post-employment activities. In that e-mail, despite having already accepted a position at Company A, CANNON claimed, "I am currently in the process of an employment offer with [Company A]. The position they are offering is as a Partner."

30.     On or about March 26, 2009, Company A informed CANNON that Company A's offer of employment was being withdrawn. Company A told CANNON that CANNON did not meet the background check requirements.

31.     On or about September 17, 2009, CANNON sent an e-mail to Company A's CEO advising that CANNON had joined a consulting firm and asking to have lunch. Company A's CEO forwarded that e-mail to other Company A employees stating, "This is a guy that was our sponsor at FEMA . . . he is so [Company A] gung ho . . . when he was applying we broke some of the rules of the US Gov on the 'how' we do it . . . so we had to let him go . . . ."

32. From on or about November 18, 2008, through on or about February 27, 2009, in the District of Columbia and elsewhere, defendant TIMOTHY W. CANNON knowingly and willfully participated personally and substantially as a Government officer and employee through decision, approval, disapproval, recommendation, the rendering of advice, investigation, and otherwise, in the BEST Workforce Initiative administered by Company A, a particular matter in which CANNON knew Company A, an organization with whom CANNON was negotiating and had an arrangement concerning prospective employment, had a financial interest.

**(All in violation of Title 18, United States Code, Sections 208(a) and 216(a)(2).)**

RONALD C. MACHEN JR.
United States Attorney

By: _____
David S. Johnson
Assistant United States Attorney
D.C. Bar No. 477298
United States Attorney's Office
for the District of Columbia
Fraud and Public Corruption Section
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 252-7873

DENIS MCINERNEY
Chief, United States Department of Justice,
Criminal Division, Fraud Section

By: _____
Brian R. Young
Trial Attorney
Ohio Bar No. 0078395
United States Department of Justice,
Criminal Division, Fraud Section
1400 New York Avenue, N.W.
Washington, D.C. 20005